818 A.2d 1198

Jonathan Paul BROOKS

v.

Mieczyslaw BIENKOWSKI.

No. 01780, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Feb. 5, 2003.

Reconsideration Denied April 10, 2003.

Ronald A. Baradel (Ruth–Ann E. Lane and Council, Baradel, Kosmerl & Nolan, P.A., on the brief), Annapolis, for appellant.

Clay M. Barnes (Barnes and Raine, P.A., on the brief), Towson, for appellees.

Argued before SALMON, HOLLANDER, PAUL E. ALPERT (Ret., Specially Assigned), JJ.

SALMON, Judge.

We are called upon to decide whether this Court, in entertaining an appeal from a judgment entered by a circuit court in banc panel, is restricted to reviewing the record provided to that panel or whether our review is of the record that was before the trial judge, even though some of that record was not before the in banc panel. This same issue was mentioned, but not decided, in *Langston v. Langston,* 136 Md.App. 203, 219–22, 764 A.2d 378 (2000), aff'd, 366 Md. 490, 784 A.2d 1086 (2001), and *Azar v. Adams,* 117 Md.App. 426, 431–34, 700 A.2d 821 (1997). We shall hold that we must review the record that was before the trial court when it entered its final judgment.

Also to be decided is whether the trial court abused its discretion in denying a motion for new trial in a case in which personal injury, wrongful death, and survivorship claims were brought and where the jury found in favor of the plaintiff as to liability and awarded him some economic damages but gave him no money for (1) loss of solatium;[1] (2) the value of the household services his deceased spouse would have rendered to him had she lived; and (3) non-economic damages for plaintiff's claimed post-traumatic stress disorder.

## I. *UNDISPUTED FACTS*

This case has its origin in an accident that occurred at 5:42 a.m. on June 13, 1997, during a very heavy rainstorm. On that date, a car driven by Jonathan Brooks, struck and killed Kazimiera Bienkowski ("Mrs.Bienkowski") near the intersection of Wellham and Cromwell Avenues in Arbutus, Maryland.

Prior to the accident, Mrs. Bienkowski, aged fifty-four, and her husband, Mieczyslaw Bienkowski ("Mr.Bienkowski"), aged sixty-one, lived on Vista Avenue with their daughter and her husband. The Bienkowskis were natives of Poland who had emigrated to this county in 1993. The two had been married for thirty-two years at the time of Mrs. Bienkowski's death. They lived less than one block from the scene of the subject accident.

On the morning of the accident, Mr. and Mrs. Bienkowski were walking to the Ferndale light rail station to catch a train, which would have taken them to Baltimore, where both worked for the Joseph A. Bank Company. The Bienkowskis' usual route to the light rail station was to walk a short distance down Vista Avenue, take a right at the intersection of Vista and Wellham Avenues, then walk one block westbound on the sidewalk that parallels Wellham Avenue (on its north side), cross Wellham by walking southbound at the crosswalk

---

1. We use the term "loss of solatium" as shorthand for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, attention, advice or counsel the surviving spouse experienced in the past or probably will suffer in the future.

controlling the intersection of Wellham and Cromwell Avenues, then proceed to the station.

The accident happened approximately midway [2] between the intersections of Wellham and Cromwell Avenues. Wellham Avenue is a two-lane road running east and west. Both lanes are approximately eleven feet in width; the lanes are separated by a double yellow line. On both sides of the travel lanes of Wellham Avenue is a solid white line; that line is three feet from the sidewalk (hereinafter "the three-foot shoulder"). In the vicinity of the spot where Mr. Brooks's vehicle collided with Mrs. Bienkowski, there is no height differential between the sidewalk and any portion of Wellham Avenue. The sidewalk is four feet in width.

Shortly before the accident, both Mr. and Mrs. Bienkowski were walking westbound on the sidewalk, on the north side of Wellham Avenue. According to police photographs taken within an hour of the accident, water had puddled on the sidewalk near where the accident occurred. The parties disagree, strenuously, as to whether Mrs. Bienkowski was still on the sidewalk when she was struck by Mr. Brooks's vehicle.

Mr. Brooks was driving his 1992 Pontiac westbound on Wellham Avenue immediately prior to the accident. He, like the Bienkowskis, was very familiar with the area.

A motorist approaching the accident site from the east (as Mr. Brooks did) would traverse a bridge that crosses Interstate 97; at the west end of the bridge, the area where the accident occurred comes into the driver's view; Wellham Avenue goes down hill and curves slightly to the right, then back to the left; at the base of the hill, the roadway straightens and intersects with Vista Avenue, at which point the driver starts up a slight incline. Wellham Avenue does not become level again until it intersects with Cromwell Avenue.

Mr. Bienkowski was walking ahead of his wife when she was struck. As a consequence he did not see the collision, nor was

---

2. Our "approximately midway" statement is based upon our review of the police photographs, rather than any direct testimony to that effect.

he struck by Mr. Brooks's vehicle. He did, however, hear the collision and saw his wife's body being thrown through the air. He ran to her, tried to give her aid and comfort, then ran to his home to get his son-in-law to help him. An ambulance was called, and the two then ran back to the scene of the accident.

The ambulance arrived at 5:49 a.m. Emergency medical personnel treated a laceration to Mrs. Bienkowski's head while she lay in the roadway, then put her in an ambulance, but Mrs. Bienkowski had no pulse and was "in full arrest" at that point. She was taken to a nearby hospital where she was pronounced dead.

Damage to Mr. Brooks's vehicle was to the right (passenger side) front area above the right headlight. Below the headlight there was a minor scrape on the bumper; additionally, there were hood dents—one above the right headlight and another near the windshield on the right side of the hood.

The accident was investigated by Anne Arundel County Police Officer C. Craig Russell, who arrived at the accident scene twenty to twenty-five minutes post accident. Officer Russell prepared an accident investigation report in which he said, *inter alia,* that he could find no evidence of accident-related skid marks.

Under the heading "conclusions," the accident report reads, in part:

> Due to the lack of a clearly defined point of impact or other evidence which could confirm the positions of both Vehicle # 1 and Pedestrian # 1 prior to the accident, it is not possible to state with absolute certainty where the parties involved in this accident were located prior to impact. However, it can be concluded that [Mrs. Bienkowski] was not on the sidewalk, therefore she had to be walking on either the shoulder or travel portion of the roadway itself. . . .

Officer Russell said in his report that he reached this last-mentioned conclusion for the following reasons:

- Pedestrian # 1's husband stated he was walking on the sidewalk was uninjured and made no contact with Vehicle # 1, indicating Pedestrian # 1 could not have been walking on the sidewalk.

- The point of impact between Pedestrian # 1 and Vehicle # 1 was approximately 1.1 feet in from the right side of the vehicle. Thus eliminating the possibility of a glancing or sideswipe impact.

- Due to the location of the point of impact between Vehicle # 1 and Pedestrian # 1, Vehicle # 1 would have to have been driving so far onto the shoulder (assuming Pedestrian # 1 was walking completely on the shoulder) that it would likely have struck Pedestrian # 1's husband walking on the sidewalk.

- The damage to Vehicle # 1, location of injuries to Pedestrian # 1, and location of the point of impact in respect to Pedestrian # 1's final resting position, suggest Pedestrian # 1 was heading toward the south side of the roadway.

- The nature and condition of the sidewalks, roadway, and Pedestrian # 1's destination, make it likely that she would cross the street somewhere between or at the intersections of Wellham Avenue and Cromwell and Vista Avenues.

- The driver of Vehicle # 1 indicted [sic] he believed Pedestrian # 1 was crossing the street in a diagonal manner when he struck her.

(Footnotes omitted.)

The investigating officer also reached these additional (but related) conclusions: (1) Mrs. Bienkowski was struck by Mr. Brooks's vehicle while she was in the "travel portion" of Wellham Avenue; (2) the primary cause of the accident was Mrs. Bienkowski's "illegal position in the roadway and her failure to yield" to Mr. Brooks's vehicle; (3) Mrs. Bienkowski's "dark clothing" was a "major contributing factor" to the accident because wearing all black in dark or near-dark conditions made it "nearly impossible for an approaching driver to identify and recognize . . . [her] until coming right up on her";

(4) Mr. Brooks's speed, which was four to six miles over the posted thirty-mile per hour speed limit, coupled with "the heavy rain and darkness," dictated that Mr. Brooks should have slowed his speed; and (5) Mr. Brooks's speed was a "contributing factor" in the accident.

Mr. Bienkowski filed a three-count complaint in the Circuit Court for Anne Arundel County, claiming that the June 3, 1997, accident resulted from the sole negligence of Mr. Brooks. Count I alleged that Mr. Bienkowski was emotionally traumatized, incurred medical bills, lost wages, and suffered other injuries as a result of the accident. Count II was a survivorship action filed by Mr. Bienkowski in his capacity as Personal Representative of Mrs. Bienkowski's estate. He sought in Count II recompense for medical bills, conscious pain and suffering of the decedent, and funeral expenses. Mr. Bienkowski's wrongful death claim was set forth in Count III, in which he asked for the recovery of economic damages caused by his wife's death, as well as solatium damages.

## II. *THE TRIAL*

A jury trial was held, presided over by the Honorable Robert Heller. The trial lasted four days, and the jury deliberated for six hours on the fifth day.

A significant portion of the evidence focused upon the issue of where Mrs. Bienkowski was positioned when she was struck by Mr. Brooks's automobile. Because there were no independent eyewitnesses to the accident, each side relied upon the opinion of an accident-reconstruction expert. The expert called by Mr. Bienkowski was Gregory M. Manning, a retired Maryland State Police officer; Mr. Brooks relied upon the expert testimony of Officer Russell. Both experts had excellent credentials, coupled with extensive experience in accident investigation and reconstruction. Both experts admitted, however, that accident reconstruction is not "an exact science." [3]

---

**3.** Proof as to the validity of that admission is (arguably) provided by the fact that the opinions rendered by the experts were diametrically opposite.

## A. *Testimony of Mieczyslaw Bienkowski*

Mr. Bienkowski, who could not speak English, testified through an interpreter.

Mr. Bienkowski and his wife took the same route every morning to the train station. To reach the station, the Bienkowskis needed, at some point, to cross Wellham Avenue, *i.e.,* from the north to the south side. The Bienkowskis never crossed Wellham Avenue at its intersection with Vista Avenue in the six months before the accident; moreover, they never crossed Wellham Avenue between the intersections of Vista and Cromwell Avenues because it was difficult to see oncoming traffic and because cars usually traveled at a fast speed in this area. For those reasons, the two routinely waited until they reached the crosswalk at the intersection of Cromwell and Wellham Avenues before moving from the north to the south side of the Street.

Mrs. Bienkowski carried an umbrella and was wearing Mr. Bienkowski's coat when the accident occurred. The coat reached almost to her ankles. Shortly before the accident, Mr. Bienkowski was walking on the sidewalk (parallel to Wellham Avenue), behind his wife, but at a faster pace. He caught up with his wife, moved around her on her right side, and passed her by walking on the grass. When he was approximately seven meters (roughly twenty-three feet) in front of his wife, and as he was stepping back onto the sidewalk from the grass, he heard a crash and saw his wife and a car go by.

The witness did not say how far either the car or his wife's body was from him when he saw them pass.

At the time of the accident, and at the time of trial, Mr. Bienkowski suffered from asthma and coronary problems. He was severely traumatized by the accident, and as a consequence, he was unable to work for about a month afterward. He compared the effect of losing his wife with losing his hands ("like cutting off his hands"). In his words, "she knew English, and she could take care of everything." Defense counsel did not cross-examine.

### B. *Statements Given by Mr. Brooks to Officer Russell*

Within one hour of the accident, Mr. Brooks wrote the following statement:

> I was traveling west on Wellham Avenue at approximately 5:45 a.m. right before I approached Cromwell Avenue. I struck a female pedestrian. The accident was over before I knew it happened. The pedestrian was in front of my car right out of nowhere.

He told Officer Russell, orally, that he thought Mrs. Bienkowski "was crossing the road from his right to his left and that she walked out in front of his car." He also said that he believed that he was driving "about thirty-five miles per hour" at the time of the accident.

On July 5, 1997, Mr. Brooks was re-interviewed by Officer Russell. He told the officer that at the time of the accident "it was raining very heavily and he believed" Mrs. Bienkowski "was crossing the street, but in a diagonal fashion and going from the corner of Vista and Wellham Avenues to the corner of Cromwell and Wellham Avenues." When asked how fast he was going, he estimated his speed at approximately "thirty-six miles per hour."

### C. *Mr. Brooks's Trial Testimony*

Mr. Brooks testified that he left his home on Wellham Avenue about two minutes before the accident. He was on his way to work at the O'Malley Senior Center in Odenton, Maryland, and was due there at six o'clock. It was unusual to see anyone walking on Wellham Avenue at that hour of the morning.

He was traveling at approximately thirty-five miles per hour, looking ahead, when he saw a "flash"—"like a light shining on metal kind of flash"—in front of his car for a "split second" before he struck Mrs. Bienkowski. He had no time to apply his brakes or steer to the left prior to impact. After the collision, he applied "medium" brake pressure and came to a stop entirely in the westbound lane of Wellham Avenue at its intersection with Cromwell Avenue.

Mr. Brooks returned to the scene and saw Mr. Bienkowski, in the roadway, cradling his wife in his arms. A man, who said his name was "Mike," arrived. The stranger said that he "almost hit" Mrs. Bienkowski (who was still laying in the roadway) and suggested that "you might want to move your car because somebody is going to hit it." Mr. Brooks followed the suggestion and parked his car on Cromwell Avenue and then continued to wait for the arrival of the police.

Mr. Brooks denied crossing over the white line onto the shoulder at any time before impact. He also denied swerving to the left either immediately before or after the impact.

On cross-examination Mr. Brooks admitted that at the time of the accident visibility was very poor due to "torrential" rainfall. He said the yellow center line on the roadway was visible and that he was concentrating on the roadway ahead of him at the time of impact. He did not remember whether the white line demarcating the three-foot shoulder was visible.

### D. *Testimony of Gregory Manning*

Mr. Manning was a Maryland State Police officer from 1974 to 1984. During that period, he regularly investigated and reconstructed accidents. He has been employed in the private sector in the field of accident investigation and reconstruction since 1984. While in the private sector, he has investigated accidents in twenty-nine states and five foreign countries. He has testified as an expert numerous times in Maryland. He also testified as an expert in eight other states and in the District of Columbia. He is a member and a co-founder of the National Association of Professional Accident Reconstructionists ("NAPARS").

Mr. Manning visited the scene of the accident for the first time on April 3, 2000, which was exactly thirty-four months after Mrs. Bienkowski was killed. He studied the scene of the accident, took measurements, and, prior to testifying, reviewed a great deal of material connected with this case.[4]

---

4. Documents studied by Mr. Manning were:

Despite the mass of material reviewed, the central basis for Mr. Manning's expert opinion was founded upon (1) a diagram prepared by Officer Russell; (2) reports from ambulance personnel and the funeral director who prepared Mrs. Bienkowski's body for burial, which showed that the major trauma was to the decedent's buttock and forehead areas; (3) photographs of Mr. Brooks's automobile showing the damage caused by the subject accident; (4) photographs of the accident scene taken by Officer Russell that depicted the post-impact position of Mrs. Bienkowski's shoes [5] and other articles of personal property Mrs. Bienkowski was carrying; and (5) photographs of the scene taken by Officer Russell showing three tire marks that the witness believed were highly significant.

In forming his opinion, Mr. Manning gave no credence to Mr. Brooks's deposition testimony, except that he did assume that Mr. Brooks's vehicle was traveling westbound at approximately thirty-five miles per hour at the time of impact. Moreover, in arriving at his opinion, Mr. Manning did not

---

Police photographs, Maryland ambulance information regarding Mrs. Kazimiera Bienkowski, Jonathan Paul Brooks's statement, emergency room records from Mrs. Bienkowski, death certificate of Mrs. Bienkowski, Maryland ambulance information from Mr. Bienkowski, emergency room records from Mr. Bienkowski, newspaper articles in reference to the traffic accident, a complaint and request for jury trial, auto stats on a '92 Pontiac Sunbird—that provides the statistics, length, width, height, things of that nature—plaintiff's answers to interrogatories, defendant's answers to interrogatories, Officer Gregory Russell's deposition, Officer Russell's deposition exhibits, Mr. Bienkowski's deposition, Jonathan Paul Brooks's deposition, . . . his own depositions, [and] Jonathan Paul Brooks's deposition exhibits.
Additionally, he
traveled Mr. Brooks's route to work to see how far it was and how long it would take me to get there. [Reviewed] Jonathan Brooks's driving record, . . . [wrote a] report . . . [and visited] the accident scene three times. . . .
[He] also reviewed [his own] depositions and exhibits. Additional exhibits provided by Officer Russell after the taking of [Mr. Manning's] depositions, medical, and ambulance run reports.

5. Mrs. Bienkowski's shoes were knocked off by the impact.

consider Mr. Bienkowski's testimony that he was about seven meters in front of the decedent when he heard the impact.

In Mr. Manning's expert opinion, Mr. Brooks's vehicle left the travel portion of Wellham Avenue and proceeded an unknown distance westbound on the sidewalk, whereupon his vehicle struck Mrs. Bienkowski from the rear; the striking vehicle then proceeded forward at the rate of 51.23 feet per second for three-fourths of a second (driver's reaction time), then swerved left at an 18.7 degree angle; as the driver steered left, Mrs. Bienkowski rolled forward on the hood and to the right and fell off the car onto the street and slid to her position of rest in the middle of Wellham Avenue; Mr. Brooks's car then proceeded across the center line onto the south side of Wellham Avenue and came to a rest there.

At deposition, Mr. Manning estimated that Mr. Brooks swerved left at a 35 degree angle—not at the lesser angle he testified to in court.

When Mrs. Bienkowski was struck, she was carrying her lunch, containing a sandwich, an apple, and other food. She was also carrying a thermos bottle and an umbrella. These items scattered across the roadway by the force of the impact. The debris field left by these items was consistent with the witness's opinion as to the path of the striking motor vehicle described above.

The witness discussed the possibility that the impact occurred in the travel portion of Wellham Avenue and rejected that possibility as he did the possibility that Mr. Brooks drove straight forward after the impact. According to Mr. Manning, if Mr. Brooks had driven straight forward, then Mrs. Bienkowski's body would not have ended up in the center of Wellham Avenue.

The witness established the point of impact by scrutinizing Exhibit 8(h), a photograph taken by Officer Russell on the morning of the accident. Exhibit 8(h) showed a circular mark on the sidewalk. Mr. Manning opined that the circular mark was left by Mr. Brooks's vehicle at the point it struck Mrs. Bienkowski. The centrality of that tire mark to the establish-

ment of the point of impact was shown by the following question and answer:

Q. [MR. BROOKS'S COUNSEL:] ... [I]sn't it a fact that much of your opinion that you have expressed today, namely that Mr. Brooks went up on the sidewalk at some unknown point, traveled for some unknown distance, struck Mrs. Bienkowski, and veered off to the left in such a way that he did not hit Mr. Bienkowski, is predicated upon what you see as tire marks in the sidewalk in [Exhibit 8(h)], correct, the semicircular [mark], I believe you described it, tire marks?

A. [MR. MANNING:] That's right. And the absence of debris to the left of it.

The witness's opinion as to the post-impact path of Mr. Brooks's vehicle was based upon a tire mark shown on Plaintiff's Exhibit 8(r). The mark is near the white (three-foot shoulder) line. That mark was made by a tire turned at an 18.5 degree angle.[6] The witness opined that this mark was left by Mr. Brooks's vehicle. Additionally, the witness saw in Exhibit 8(r) a tread mark on the yellow center line of Wellham Avenue. That tread mark was also left by Mr. Brooks's Pontiac Sunbird, according to Mr. Manning.

On cross-examination, Mr. Manning admitted that from the photographs he could not determine the type of car that had left the aforementioned three tire marks, nor could he determine in what direction the vehicle that left the mark was traveling. Finally, from the tire marks alone, he could not tell when the mark had been left on the highway. He stressed, however, that the marks shown on the photographs, when viewed in conjunction with the debris field left by the impact, persuaded him, to a reasonable degree of scientific certainty, that the tire marks were those of Mr. Brooks's vehicle.

---

6. In deposition, Mr. Manning said, evidently in a joking manner, that the tire treads shown in that photograph were ones "only Greg Manning can see."

### E. *Testimony of C. Gregory Russell*

Officer Russell has been employed in the traffic section of the Anne Arundel Police Department since 1990. His primary job responsibility is to investigate fatal and other serious accidents. The bulk of his duties are in the field of accident investigation and reconstruction. An accident reconstruction usually takes him between forty and a hundred hours. He has personally reconstructed eighty to a hundred accidents and participated in the reconstruction of "probably 300" more. The witness has been qualified as an expert witness in the courts of Anne Arundel and three other Maryland counties. Since 1994, he has been certified as a qualified accident reconstructionist by the Accident Accreditation Commission for Traffic Accident Reconstructionists (AACTAR), a nonprofit organization that tests and certifies accident reconstructionists.

When Officer Russell arrived at the accident scene, Mrs. Bienkowski's body had been removed to the hospital. He established that her body ended up in the middle of the roadway based upon what he was told by a police officer at the scene who had observed the body, coupled with the fact that he saw both blood on the roadway and gauze pads used by the paramedics near the center lane.

After photographing and diagraming the accident scene, Officer Russell went to the hospital where he viewed Mrs. Bienkowski's body and saw that she had two broken legs. This was obvious because her legs had "an unnatural bend." He also observed a cut on the side of her right leg due, "apparently," to having been "impacted by the bumper" of Mr. Brooks's car. He also saw a horizontal cut on her pant leg.

After viewing Mrs. Bienkowski's body, he talked to Mr. Bienkowski by using a "middle age" white male as an interpreter. He could not recall the time of the interview, but he believed it was at approximately 8:00 a.m. on the morning of the accident. Mr. Bienkowski, although upset, was seated in a

chair and physically seemed to be fine at the time of the interview.[7]

In Officer Russell's opinion Mr. Brooks was traveling on Wellham Avenue in the travel portion of the roadway when Mrs. Bienkowski entered the roadway and stepped in front of Mr. Brooks's vehicle; when she was struck, Mrs. Bienkowski's body went onto the hood and slid to the roadway, landing near the center line.

Officer Russell conceded, as he had in his report, that in this case it was impossible to determine the exact point of impact because there were no tire marks, scuff marks from the decedent's shoes, or other identifying marks that would demarcate the exact point where Mrs. Bienkowski was positioned when struck.

In regard to the semi-circular mark on the sidewalk, shown on Exhibit 8(h), which Mr. Manning believed to be a tire mark left by Mr. Brooks's vehicle, Officer Russell testified that he used a "flat bed computer scanner" to show greater detail in that photograph. The computer enhancement of Exhibit 8(h)

---

7. Officer Russell was not asked during his testimony what Mr. Bienkowski told him, but his accident report was introduced into evidence. The portion of the report dealing with the interview read:

It should be noted that Mr. [Bienkowski] is the husband of the victim and only spoke Polish. Therefore he had to be questioned through the use of an interpreter, who was [a] friend of . . . Mr. [Bienkowski's] . . . For that [reason] I was not able to confirm whether my questions were being presented to Mr. [Bienkowski] as I asked them or if Mr. [Bienkowski] or the interpreter were answering my questions.

Mr. [Bienkowski] indicated that he and his wife, Pedestrian # 1, were walking east [sic] on Wellham Avenue heading to the Ferndale Light Rail Station so they could go to work. I was then told that he said he was walking on the sidewalk and that his wife was walking next to him on his left. (Later the interpreter stated that Mr. [Bienkowski] said his wife was walking slightly in front of him.) I was told that Mr. [Bienkowski] indicated that is [sic] a car heading down Wellham Avenue hit [his] wife, and he just remembers her flying through the air until landing in the roadway. He then ran to help her and stayed with her until help arrived. When asked if he could recall where the car was when it hit his wife, he was unable to provide any more specifics other than it was going the same direction as they were on Wellham Avenue.

showed that the mark in question was not left by a tire. What Mr. Manning thought to be a tire mark was, in fact, clumps of grass growing in the cracks of the sidewalk. A closeup of the photograph also showed that there was standing water on the sidewalk adjacent to where the accident occurred.[8]

Officer Russell established the approximate point of impact by a study of the debris field left by the broken glass liner of Mrs. Bienkowski's thermos bottle, along with other items she was carrying. According to the witness, the evidence "suggests strongly" that the thermos bottle's glass lining broke upon impact with Mr. Brooks's car, and not when the thermos bottle "hit the ground."

The approximate area of impact was shown in Officer Russell's report as an elliptical area that, on its southmost side, is about one-third of the way into the travel lane of Wellham Avenue and, at its northmost side (*i.e.,* to the right of the white line), near the edge of the sidewalk. He admitted that it was possible that Mrs. Bienkowski was to the right (north) of the white three-foot shoulder line at the point of impact. He nevertheless opined that Mrs. Bienkowski was attempting to walk across the westbound lane of Wellham Avenue (north to south) when struck. He supported that opinion by computer generated diagrams showing that a person walking south, when struck by a car going west, would go onto the hood of the automobile and roll right to left (from the driver's perspective). This would account for the body coming to rest in the middle of the roadway. According to the computer diagram—and Officer Russell's testimony—if, as Mr. Manning theorized, Mrs. Bienkowski had been walking west and was hit by a westbound car that turned left, she would have ended up on the grass to the right of the sidewalk—not in the middle of Wellham Avenue. Furthermore, the witness testified that, if Mrs. Bienkowski was walking twenty-three feet in back of her husband, it would be "impos-

---

8. Defense counsel suggested that the standing water was the probable reason Mrs. Bienkowski left the sidewalk and attempted to cross Wellham Avenue prior to the impact.

sible" for a driver to swerve in the twenty-three feet that separated the two pedestrians because, at thirty-five miles per hour, Mr. Brooks would have had to perceive the danger and reacted within one-half of one second (the perception/reaction time); the average perception/reaction time is 1.6 seconds. Also, a computer generated diagram showed that "if [a] car is turning to the left and the pedestrian is walking away from the car then [the pedestrian's body] will 'effectively' travel toward the right side of the car when struck."

### F. Testimony of Witness Called to Contradict Certain Aspects of Officer Russell's Testimony [9]

Lt. Greg Novac of the Anne Arundel County Fire Department arrived at the scene of the accident at 5:49 a.m. Shortly after his arrival, he and another officer took "trauma shears" and cut the pants that Mrs. Bienkowski was wearing, from the bottom of the pants leg to the top on both sides. He examined Mrs. Bienkowski's legs and found that there was "nothing out of the ordinary" in their appearance.

David J. Weber, the mortician who prepared Mrs. Bienkowski's body for burial, testified that the body had "extensive bruising on the buttocks and thighs but her legs did not appear to be broken."

Alisha Janus, a friend of the Bienkowskis' family, testified that she was present at the hospital at approximately 8:00 a.m. when Officer Russell arrived. At that point, oxygen was being administered to Mr. Bienkowski as he lay on a hospital bed. Mr. Bienkowski was crying, having an asthma attack, and was extremely upset. Despite Mr. Bienkowski's condition, Officer Russell began to ask him questions while Ms. Janus served as a translator. Because of Mr. Bienkowski's condition, she had to keep repeating the questions. After Officer Russell asked

---

**9.** Officer Russell was called by plaintiff; plaintiff's counsel then called witnesses who contradicted portions of the officer's testimony. Later, Officer Russell was called as an expert witness by the defense. The summary of Officer Russell's opinions, set forth *supra*, encompasses the major points of Officer Russell's entire testimony.

"four or five questions," Ms. Janus told him that Mr. Bienkowski was "too upset to answer . . . questions." Questioning was then discontinued.

Dr. Kenneth Williams, Mr. Bienkowski's personal physician, testified that emergency room records show that Mr. Bienkowski was administered Ativan intravenously at 6:20 a.m. and again at 7:20 a.m. on the date of the accident. In the amounts given to Mr. Bienkowski, the medication would begin acting within fifteen minutes and would decrease "recall memory" for "at least eight hours."

## G. *Bruce Hamilton, Ph.D.*

Dr. Hamilton, a Professor of Economics at Johns Hopkins University, was called by plaintiff and testified that the value of the household services Mrs. Bienkowski would have provided to her husband but for the accident was $214,230. His calculations were based upon the cost of equivalent services in the commercial market place for various chores, *i.e.*, what it would cost a person to hire, for instance, a cook or a housekeeper to perform the services previously performed by the decedent. The study, upon which Dr. Hamilton relied, showed that in two adult households the value of services provided by a spouse in the fifty to sixty-four year age range was $9,548 per year; in the sixty-four to seventy-five year age range, the spouse performed household services worth $14,545 annually; [10] and in the seventy-five and above age range, services worth $10,817 annually are performed.

The $214,230 figure was not based upon the joint life expectancy of Mr. and Mrs. Bienkowski. Instead, the calculations were made for the thirty-year period between 1997 and 2027. For each of the thirty years, the witness used life charts to determine the likelihood that Mr. Bienkowski would still be alive.[11] For instance, in the final year, 2027, when Mr.

---

**10.** The value goes up in the sixty-four to seventy-five age range because, usually, the spouse is no longer employed outside the home—and therefore performs more services at home.

**11.** Dr. Hamilton explained why he used a thirty-year period:

Bienkowski would be ninety-one, there would be a low-percentage chance that Mr. Bienkowski would still be living; for the final year, he took that low percentage and multiplied it by the cost for services rendered. Dr. Hamilton brought with him damage calculations for 2007, 2017, and 2027. He did not, however, bring with him calculations for other years.[12] Also, by a methodology that is not here important, he estimated that Mr. Bienkowski suffered an economic loss of $20,600 due to the loss of Mrs. Bienkowski's future income.

## H. *Manuel Smith*

Mr. Smith, a defense witness, earned a Bachelor's Degree in mathematics and economics in 1964 from the University of Massachusetts; he received a Master's Degree in economics at Washington University in St. Louis; and he completed the doctoral program at Washington University but did not finish his dissertation and therefore does not have a doctorate in economics. After teaching economics at Washington University and Pennsylvania State University, he took a job with the federal government where he has worked since 1970. He presently is a program analyst for the United States Department of Education. In addition, for the last twenty-three years he has had an economic consulting practice, which endeavors "to assist the court in economic analysis of . . . damages" in cases similar to the present one.

Based on life tables, Mr. Smith determined that, as of the date of trial, Mrs. Bienkowski had a life expectancy of 25.8

---

Just coming up with a number. Let's say the joint life expectancy is another 15. That['s] a hypothetical. I'm making it up. To just use that, calculate up to 15 years and then, boom, stop is equivalent to assuming that with absolute certainty they would both live for another 15 years, and then on the same day they would both die.

The reality is, at each year between the date of the accident and the end of the life tables, there is a possibility of death for each one of them. That's why it's better to take account of it year by year.

**12.** The figure set forth in his calculation of cost of services per year was adjusted upward for inflation and a one percent annual salary increase, then reduced to present value.

years; and Mr. Bienkowksi, aged sixty-four, had a life expectancy of 16.7 years. From "various economic studies of people doing household work," he estimated that, had she lived, Mrs. Bienkowski would have performed twenty hours of household services per week for 16.7 years. He calculated the worth of those services at six dollars per hour (roughly the average of the $5.15 minimum wage and what Mrs. Bienkowski was earning at the time of her death). He assumed a 5.1 percent annual increase in wages for 16.7 years, but this was more than offset by a 6 percent discount to account for the advantage received by getting money immediately, rather than receiving it when earned. Using this methodology, Mr. Smith calculated, "to a reasonable degree of professional certainty," that the present value of Mrs. Bienkowski's lost household services was $96,437.

He testified that his estimate that Mrs. Bienkowski would provide twenty hours per week in household services for 16.7 years was "liberal" and explained why:

So knowing that she was going to work were she still alive today for, say, six or more years, I took a number of hours per week from nationally published data, tables, studies that I've looked at for women of her age and so forth, took into account that she'd be working probably close to full time, and arrived at twenty hours as an average for that sixteen-year period.

Now you can say that as she got older—and don't forget, if she was going to—she would be age seventy-four at the time that he would be close to eighty-one, at the end of his expected work life, she's not likely to work as much around the house at age seventy-four as she might at age fifty-seven. So over this sixteen-year-period she might put in twenty-five hours a week now and twenty in five or eight years and maybe only fifteen or maybe none at all when she's in her mid-seventies. And twenty hours a week is a pretty hefty amount of work around the house for a full-time person. It's three or four hours a day after working a full day. And the national studies show that women that

age work generally less than that around the house. So I was pretty liberal in giving her twenty hours.

### I. *The Jury Verdict*

The jury found that Mr. Brooks was negligent and that his negligence caused the subject accident. The jurors also found that Mrs. Bienkowski was not guilty of contributory negligence. In regard to Mr. Bienkowski's individual claim for personal injuries caused by the accident, the jury awarded him past medical expenses in the amount of $250.47 and past lost wages of $840. They awarded him no non-economic damages for his personal injury claim.

The damages awarded to Mrs. Bienkowski's estate were: $54 in medical expenses; $5,000 for funeral expenses, and zero dollars for the decedent's "non-economic damages."

In regard to Mr. Bienkowksi's wrongful death claim, the jury awarded him $20,600 for the loss of his wife's earnings during their joint lives, which was the estimate Dr. Hamilton had provided. The jury awarded no damages for the replacement value of Mrs. Bienkowski's household services and no "non-economic damages," which were defined (for purposes of the wrongful death claim) as "any damages that you assess for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, attention, advice or counsel the surviving spouse has experienced or probably will experience in the future." All told, the award amounted to only $26,744.47.

### J. *Motion for New Trial as to Damages Only*

Mr. Bienkowski filed a motion for new trial as to damages only, in which he alleged that the jury ignored, disregarded, or was confused concerning evidence presented in regard to damages, and/or the trial court's instructions regarding damages. Also, movant asserted that "the conscience of the court" should be shocked by the fact that the jury failed to award him any economic damages for the loss of his wife's household services, no solatium damages for the wrongful death of his

wife, and no non-economic damages "for his own serious and permanent injuries."

A hearing was held on the motion, after which Judge Heller took the matter under advisement. On February 6, 2001, Judge Heller filed a memorandum opinion that reviewed the procedural history of the case, some of his impressions developed at trial, and the contentions made by the parties in respect to the motion.

Judge Heller commenced his discussion by citing *Buck v. Cam's Broadloom Rugs, Inc.,* 328 Md. 51, 612 A.2d 1294 (1992), and *Butkiewicz v. State,* 127 Md.App. 412, 732 A.2d 994 (1999), and stating that he was mindful of his responsibility to prevent a miscarriage of justice due to an improper verdict and was likewise mindful that he should not "casually overturn the verdict of the jury." He then said that his conscious was not shocked by the jury's damage verdict. He noted that the jury "awarded the plaintiff those damages sought by [him] with respect to all matters except non-economic damages and damages for the replacement value of Mrs. Bienkowski's household services." The trial judge found "no support for movant's argument that the jury was confused about the [damage] evidence ... or confused by the court's instructions regarding [those] damages, or that the jury ignored or disregarded the evidence and/or the [c]ourt's instructions regarding the plaintiff's damages."

More surprising to Judge Heller than the jury's failure to award certain damages to the movant was the fact that the jury "found in favor of plaintiff and against the defendant on liability, especially given the testimony of the reconstruction experts called by" the parties. In this regard, Judge Heller found Officer Russell "far more credible ... in both his opinions and [the] basis for [those] opinions" than the testimony of Mr. Manning. He also said, without equivocation, that he believed Mr. Manning's testimony to be "not credible."

Judge Heller acknowledged that, while the jury was entitled to judge the credibility of all witnesses in reaching its verdict, he nevertheless was also mindful that a trial judge, in consid-

ering a motion for new trial, was called upon "to evaluate the character of the testimony" produced at trial "in order to determine whether justice has been done."

Judge Heller recalled that upon hearing the jury verdict he "suspected that the jury had ... reached a compromised verdict." Therefore, he did not believe that it would be fair to the parties if he took at "face value" the verdict sheet as it related to liability issues and some of the damage issues while not taking at "face value" the decision of the jury to not award damages in certain categories.

Judge Heller denied the motion for new trial and in doing so concluded by noting that movant opposed the granting of a new trial as to all issues and asked the court to grant a retrial as to damages only. Judge Heller opined that a retrial as to damages only, as requested by movant, would be unfair to the defendant.

## K. *Petition for In Banc Review*

Mr. Bienkowski filed a timely "Notice for In *Banc* Review." In a supporting memorandum, he contended that Judge Heller abused his discretion in denying the motion for new trial.

Prior to the hearing by the three-judge in *banc* panel, the parties entered into discussions as to whether it would be necessary to produce the entire transcript of trial testimony for the panel's review. By a letter dated April 20, 2001, the parties agreed as follows: (1) by April 26, 2001, Mr. Bienkowski's attorney would fax to Mr. Brooks's attorney a suggested summary of the testimony and evidence at trial; (2) by May 3, 2001, Mr. Brooks's attorney would fax to opposing counsel "any revisions or additions that" he wanted to make "to the proposed summary"; (3) based on the summary and proposed revisions, if there were any disagreements, the attorneys were to confer with an eye to stipulating "to as much of the testimony and evidence" as possible; (4) each side would set forth in their memorandums to the court their respective positions as to any areas of disagreement that still existed; (5) counsel for Mr. Bienkowski was to submit his memorandum to

the court no later than June 18, 2001, and counsel for Mr. Brooks was to submit his memorandum within twenty-one days thereafter; and (6) to the extent that there was a conflict as to facts in the respective memoranda as to what evidence was presented at trial, the in *banc* panel would notify the attorneys as to whether any testimony needed to be transcribed and, if so, who would pay for the transcript.

On April 26, 2001, counsel for Mr. Bienkowski sent opposing counsel a "proposed summary of testimony presented by plaintiff's witnesses" and a list of plaintiff's exhibits that had been admitted at trial. Despite its title, the paper did not summarize the testimony of seven of the twelve plaintiff's witnesses mentioned; counsel merely stated the subject about which seven of the witnesses testified, rather than summarizing what the witnesses had said. For instance, in regard to Officer Russell, whom plaintiff called as his own witness, the summary reads: "Investigating police officer, did not observe the collision or either party, or the decedent at the accident scene.... Testified in [p]laintiff's case as to his observation and activities upon arrival at accident scene, as well as his follow-up investigation of the accident."

The paper did summarize, albeit in a very general way, the testimony of Dr. Williams, Dr. Hamilton, Mr. Manning, Mr. Bienkowski, and Captain Douglas Fishel of the Anne Arundel County Fire Department who treated Mr. Bienkowski immediately after the accident. Captain Fishel testified that Mr. Bienkowski was suffering from hypothermia and post-traumatic stress disorder secondary to the accident when he observed him shortly after the accident.

On June 18, 2001, Mr. Bienkowski's attorney filed a "memorandum in support of his request for in *banc* review," in which counsel complained that Mr. Brooks's counsel did not respond to his proposed summary by May 3 as had been agreed. According to the memorandum, on May 24, 2001, Mr. Brooks's lawyer did send him a letter "claiming that [p]laintiff's summary was not a summary and that there was nothing for him to revise or edit." Counsel for Mr. Bienkowski disagreed with

this characterization and asserted that defense counsel had "waived any right to challenge or dispute the facts as submitted in the summary sent on April 26, 2001."

After asserting that defense counsel had waived his right to challenge or dispute the facts set forth in plaintiff's summary, plaintiff's memoranda then proceeds to discuss testimony of various witnesses who appeared at trial but whose testimony had never been summarized by plaintiff's counsel. By way of example, plaintiff's counsel summarizes in his memorandum the testimony of Mr. Brooks and Dr. Manuel Smith, although none of their testimony was mentioned in the April 26 proposed summary.

Counsel for Mr. Brooks filed a memorandum in response on July 9, 2001. In the "Statement of Facts" section of the memorandum, Mr. Brooks's counsel analyzes, in detail, testimony concerning the happening of the accident and the testimony of the two experts. Few of the facts summarized in the memorandum are mentioned in the proposed summary of April 26.

The in *banc* panel heard argument from counsel on September 6, 2001. The panel raised no questions as to exactly what facts were before them.

Counsel for Mr. Bienkowski conceded to the panel that Judge Heller was "a wonderful trial judge." Nevertheless, he contended that in considering the new trial motion, Judge Heller "got hung up" by substituting his view of the liability issue for that of the jury. According to counsel's argument, what Judge Heller should have done was to have disregarded the liability issue and focused exclusively on the issue of whether the jury verdict as to damages was fair and reasonable in light of the evidence as to damages that was "presented and uncontradicted."

In his argument to the panel, counsel for Mr. Brooks asserted that the most likely explanation for the meager damage award was that the jury arrived at a compromised verdict. Counsel also maintained that there was no reason to believe that the jury disregarded the court's instructions. He

pointed out (accurately) that the jury was told that they were entitled to "reject some or all of any witness's testimony" and that all questions on the special verdict sheet concerning damages began with the words, "What if any damages do you award for . . . ."

Defense counsel was asked by one of the in *banc* panel members whether his expert economist "conceded that [Mrs. Bienkowski] clearly performed household services and that they were valued at" $96,000. Defense counsel answered:

[T]hat is an excellent question. It wasn't put to him in terms of "if" or "Do you concede it?" He was assuming, as was the plaintiff's expert, that she had performed household services.

THE COURT: Well then, I imagine there was testimony about it, right—

[DEFENSE COUNSEL]: There was testimony about—I was not in any position to offer contradictory services, I mean, the lady was deceased. I don't know what her situation was at the time. And that is why I say, not being able to offer evidence in contradiction of a point, doesn't mean that we concede the point, or that the point is still not contested or controverted.

THE COURT: Right. But I just want to make clear—

[DEFENSE COUNSEL]: I mean, just like I did not cross-examine Mr. Bienkowski on, you know, his post-traumatic stress disorder, or whatever. I, as a tactical matter, was not about to go over—go after Mr. Bienkowski as I did Mr. Manning, or something. I'm not—I'm not real smart, but I'm not that stupid. I wasn't about to tell the jury, "Watch this. Let me take this man apart," after all that has happened to him. No. But that doesn't mean that I am conceding that there is all of these things, no. Everything was contested. And both experts' testimony rests on the assumption that certain acts took place.

Defense counsel then proceeded to argue that the jury was free to "accept or reject foundational evidence that goes into an expert's opinion." He also reiterated that the mere fact

that he could not produce evidence showing that Mrs. Bienkowski did not perform household services "doesn't mean that I am conceding that the jury must accept that evidence, or conceding that the jury had to make an award of damages."

After taking the matter under advisement, the panel filed a sixteen-page "Memorandum and Opinion" on October 15, 2001. The in *banc* panel ruled that Judge Heller had abused his discretion in failing to grant a new trial as to damages only. Included in the opinion is the following statement:

> On February [sic] 6, 2001, the [p]anel heard arguments, and the parties agreed to specific undisputed evidence. This evidence indicated Mrs. Bienkowski performed household services before her death. Additionally, [p]laintiff's economic expert testified at trial that [p]laintiff's loss of household services was valued at $214,230.00. Whereas, [d]efendant's expert valued the loss of Mrs. Bienkowski's household services at $96,437.00.

The in *banc* panel's opinion does not discuss, in any fashion, the testimony regarding liability, nor does it discuss, or even mention, Judge Heller's view of the liability issue or his belief that the jury returned a compromised verdict. Moreover, save for the excerpt above quoted, the panel's opinion does not discuss *any* of the evidence presented at trial.

The in *banc* panel opined that there was no controlling Maryland precedent that governed their decision. Therefore, it relied on *Linville v. Moss,* 189 W.Va. 570, 433 S.E.2d 281 (1993); *Johnson v. Smith,* 241 Va. 396, 403 S.E.2d 685 (1991); and *Flagtwet v. Smith,* 367 N.W.2d 188 (S.D.1985), and, *after remand,* 393 N.W.2d 452 (S.D.1986). Reliance upon those out-of-state cases was misplaced.

The *Johnson* and *Flagtwet* cases were ones where liability was not "seriously disputed." *See Johnson,* 403 S.E.2d at 687; *Flagtwet,* 367 N.W.2d at 189. Liability was seriously disputed in *Linville,* but the *Linville* case noted that West Virginia has been a comparative negligence state since 1979, and also stressed that the jury had found the defendants fifty-one percent liable and the decedent forty-nine percent liable. 433

S.E.2d at 286–89. The court in *Linville* rejected the possibility, which was recognized in pre–1979 West Virginia cases, that a motion for new trial could be validly denied on the basis of a compromised verdict, *i.e.*, "a defendant's verdict perversely expressed" as shown by the award of only nominal damages. *Id.*

The in *banc* panel disagreed with Judge Heller's statement that there was no indication that the jury was confused by the jury instructions or that the jury disregarded those instructions. In the panel's view, it could be "fairly concluded from a simple reading of the jury entries on the Verdict Sheet that there could be no rational basis for a failure to award any money damages for household services." There being no rational basis, "the jury either did not understand the instructions, or chose to disregard them," which "was not an option."

The in *banc* panel did not discuss whether there was any rational basis for the jury to fail to award Mr. Bienkowski non-economic damages on his individual claim or solatium damages in the wrongful death action.

## III. *ANALYSIS*

### A. *The Record to Be Reviewed*

Appellant filed with this Court the entire transcript of the trial. And, in his record extract, appellant printed, *inter alia*, 428 pages of trial testimony.

Appellee filed a motion asking this Court to strike from the record the trial transcript and to also strike "all references contained in the record extract to the trial transcript and to all additional facts not specifically presented to, considered by[,] and relied upon by the in *banc* panel. . . ."

Movant asserts that,

[c]onsistent with a written stipulation of the parties dated April 20, 2001, and in accordance with the provisions of *Maryland Rule 2–551(d),* the record of the trial testimony presented to, reviewed by and relied upon by the in *banc* panel was *limited to* a written *summary* of that testimony,

as set forth in [p]laintiff's Memorandum and to certain facts stipulated at the hearing before that panel on September 2, [sic] 2001.

(References to record extract omitted.)

Movant stresses that in a letter to the in *banc* panel chairman, dated July 16, 2001, counsel for Mr. Brooks had said that,

> having reviewed the two statements of fact contained in the party's memoranda, I see no need for a transcript of testimony. While I may disagree with some of Mr. Barnes's [counsel for Mr. Bienkowski] characterization of the effect of the testimony offered at trial, that is a matter of argument, and not something that would be resolved by a transcript.

Movant also asserts that, because an appeal to an in *banc* panel is akin to an appeal from the circuit court to the Court of Special Appeals, the stipulation set forth in the letters exchanged between counsel is analogous to a "statement of the case in lieu of the entire record," as permitted by Maryland Rule 8–413(b). Appellee's counsel argues:

> To permit [a]ppellant to *expand* or supplement the record to be considered on appeal to this Court would not only unilaterally invalidate the parties' stipulation, it would also completely undermine the *agreed process* employed by the parties to present the facts of this case to the in *banc* panel. More importantly, it would also subvert the integrity of the basis for the in *banc* decision in this case and could permit [a]ppellant, in effect, to nullify the basis of that panel's review. No cause—let alone good cause—has been demonstrated by [a]ppellant to permit him to disavow his previous stipulation regarding the content of the trial court and the agreed facts to be considered upon review of the trial court's ruling on [a]ppellee's Motion for New Trial. To allow [a]ppellant to do so *now* would be manifestly unfair and prejudicial to [a]ppellee.

Defense counsel counters that the agreement made before the in *banc* panel was made pursuant to Maryland Rule 2–

551(d),[13] which governs appeals to an in *banc* court. Defense counsel asserts:

> [T]here was never any agreement that a transcript of testimony would not be utilized in the event of a *further appeal.* The agreement, such as it was, governed only the proceedings before the in *banc* panel in the Circuit Court for Anne Arundel County. It was never meant to include further proceedings; that matter was never even the subject of discussion between the parties' counsel.
>
> ... Maryland Rule 8–413 ... required that the [a]ppellant order a written transcript to be included as part of the record on appeal, a requirement that can be dispensed with only upon agreement of counsel and approval of the lower court.
>
> ... There is not, and never has been, an agreement or stipulation between counsel that [sic] to do away with a transcript or a record extract in *this appeal.* There is not, and never will be, an agreed statement of facts or a signed statement such as that described in Maryland Rule 8–413(b).

(Footnote omitted.)

Defense counsel disagreed with his opponent's assertion that on an appeal from an in *banc* panel the Court of Special Appeals is to review only the material presented to the in *banc* panel. Instead, according to defense counsel, this Court must review the full record in order to determine whether Judge Heller abused his discretion.

Although both parties vigorously assert their respective positions, neither provides any helpful authority to answer the

---

**13.** Maryland Rule 2–551(d) provides:

**Transcript.** Promptly after the filing of memoranda, a judge of the panel shall determine, by reviewing the memoranda and, if necessary, by conferring with counsel, whether a transcript of all or part of the proceeding is reasonably required for decision of the questions presented. If a transcript is required, the judge shall order one of the parties to provide the transcript and shall fix a time for its filing. The expenses of the transcript shall be assessed as costs against the losing party, unless otherwise ordered by the panel.

question of whether this Court, in entertaining an appeal from a judgment of an in *banc* panel, is restricted to a review of the material before the panel or whether the review is to be of the entire record that was before the trial court.

This case is unusual in one respect. Although there was a stipulation between counsel, which was set forth in appellant's counsel's letter of April 20, 2001, *neither* party abided by the terms of the stipulation. As mentioned earlier, the parties agreed that counsel for Mr. Bienkowski, by April 26, would fax to opposing counsel a "suggested summary of the testimony and evidence at trial." Counsel for appellee did not even attempt to summarize the testimony of any witness called by the defendant. And, the only summary provided by appellee's counsel was as follows:

1. "[Kenneth H. Williams, M.D., F.A.C.P.] [t]estified that in his professional medical opinion, Mr. Bienkowski suffered profound post-traumatic stress disorder as a result of observing the accident and Mrs. Bienkowski's death and that the condition is permanent."

2. "[Captain Douglas Fishel] ... [t]estified to his observation regarding treatment of [Mr. Bienkowksi] at the accident scene, including the fact that [he] was suffering from hypothermia and Post–Traumatic Stress Disorder secondary to the accident."

3. "[Bruce W. Hamilton, Ph.D., Johns Hopkins University] ... [t]estified that the present value of the economic loss to [p]laintiff as the result of decedent's death was $234,830, comprised of $20,600 for loss of future income and $214,230 for loss of household services."

4. "[Gregory A. Manning] ... [t]estified that in his opinion [the defendant's] vehicle left the travel portion of the highway and struck Mrs. Bienkowski."

5. "[Mr. Bienkowski] ... [t]estified that he and his wife were walking to the Ferndale light rail station in route to work and [were] *on or adjacent to the sidewalk when defendant's vehicle left the travel portion of Wellham*

*Avenue and struck Mrs. Bienkowski."* (Emphasis supplied.) [14]

As mentioned earlier, in plaintiff's "proposed summary," seven additional witnesses were called by plaintiff, but, instead of summarizing their testimony, plaintiff's counsel merely states the subject about which the witnesses testified.

The proposed summary, which appellee's counsel now says was binding on the in *banc* panel, does not even mention the testimony of Manuel Smith or any other witness called by defendant. Moreover, movant's counsel, both in his memorandum, which he filed with the in *banc* court, and in his oral argument before the in *banc* panel, made reference to many facts that are not in the proposed summary or in the trial exhibits. Therefore, the position appellee takes in this Court is inconsistent with the one taken before the in *banc* panel.

The *in banc* panel never mentioned the dispute between the parties as to what facts were to be reviewed. And, as far as we can determine, the panel did not rely on any facts in plaintiff's proposed summary. The in *banc* panel's opinion does say that "the parties agreed to specific undisputed evidence," but in the next two sentences it makes clear that the "undisputed evidence" to which it refers is the evidence that "Mrs. Bienkowski performed household services before her death" and that plaintiff's expert valued those household services at $214,230, and defendant's expert valued the loss of those services at $96,437.

■ While the issue of what facts were actually before the in *banc* panel is muddled, ultimately the cloudy state of the record is irrelevant, because we hold that in an appeal from an in *banc* panel, this Court must review *all* relevant facts that were before the trial judge—not merely the facts before the in *banc* panel.

---

14. The underlined portion of the summary is inaccurate in that Mr. Bienkowski never said that his wife was "on or adjacent to the sidewalk" when she was struck or that Mr. Brooks "left the travel portion of Wellham Avenue and struck Mrs. Bienkowski."

In *Azar v. Adams*, 117 Md.App. at 431–35, 700 A.2d 821, and later in *Langston v. Langston*, 136 Md.App. at 221–22, 764 A.2d 378, we discuss, in detail, the nature of an in *banc* appeal. These decisions illuminate the following points: (1) the right of an unsuccessful litigant in the circuit court to appeal to an in *banc* panel, made up of three circuit court judges, is guaranteed by Article IV, Section 22, of the Maryland Constitution; (2) an in *banc* panel functions like an intermediate appellate court, in that it is not empowered to set aside factual findings of the trial court, unless those findings · are clearly erroneous; (3) the decision of an in *banc* panel may not be·appealed by the party who sought the in *banc* review; and (4) when an appeal from an in *banc* panel concerns an issue regarding a discretionary ruling of the trial judge, our review of the in *banc* panel's decision "necessarily requires us to consider" whether the trial judge properly exercised his discretion. *Langston, supra,* 136 Md.App. at 221–22, 764 A.2d 378.

The aforementioned general principles, however, do not help answer the question of whether our review is limited to the record before the in *banc* panel or whether we are required to review the entire record of the trial court proceeding.

In *Estep v. Estep*, 285 Md. 416, 417, 404 A.2d 1040 (1979), the Court of Appeals addressed several questions, one of which was whether this Court erred in dismissing an appeal from a judgment entered by an in *banc* panel. The *Estep* Court ultimately held that no appealable final judgment had been entered in the trial court, and thus the case should have been dismissed. *Id.* at 418, 404 A.2d 1040. In Footnote 4 of the opinion, Judge Digges, for the Court, discussed Article IV, Section 22, of the Maryland Constitution,[15] as follows:

---

15. Article IV, Section 22, provides: ·

 **Reservation of points or questions for consideration by court in banc.**

 Where any Term is held, or trial conducted by less than the whole number of said Circuit Judges, upon the decision or determination of any point, or question, by the Court, it shall be competent to the party, against whom the ruling or decision is made, upon motion, to

In the advent of a determination by a court in banc adverse to the nonmoving party, section 22 provides that such a decision "shall not preclude the right of Appeal, or writ of error to the adverse party, in those cases, civil or criminal, in which appeal, or writ of error to the Court of Appeals may be allowed by Law." Md. Const., Art. IV, § 22. This "right of Appeal" is nonetheless subject to the caveat, found in the final clause of section 22, that it, along with the rest of section 22, "shall be subject to such provisions as may hereafter be made by Law." While prior to creation of the Court of Special Appeals in 1966, see 1966 Md. Laws, ch. 11, § 1, this Court was the sole tribunal before which any right of appeal from a court in banc could possibly have been exercised, this is no longer the case. Acting pursuant to the power granted it by section 14A of Article IV of the Maryland Constitution, the General Assembly has enacted sections 12–307 and 12–308 of the Code's (1974, 1978 Cum. Supp.) Courts Article by which it has made clear its intent that, unless some specific legislative enactment provides otherwise, see, e.g., Md.Code (1974 & 1978 Cum.Supp.), §§ 12–305, –403 of the Courts Article (appeal from final judgment in the District Court of Maryland is to be the circuit court with further review only upon grant of writ of certiorari by the Court of Appeals), the Court of Appeals

---

have the point, or question reserved for the consideration of the three Judges of the Circuit, who shall constitute a court in banc for such purpose; and the motion for such reservation shall be entered of record, during the sitting, at which such decision may be made; and the several Circuit Courts shall regulate, by rules, the mode and manner of presenting such points, or questions to the court in banc, and the decision of *the said Court in banc shall be the effective decision in the premises, and conclusive, as against the party, at whose motion said points, or questions were reserved; but such decision in banc shall not preclude the right of Appeal, or writ of error to the adverse party, in those cases, civil or criminal, in which appeal, or unit of error to the Court of Appeals may be allowed by Law.* The right of having questions reserved shall not, however, apply to trials of Appeals from judgments of the District Court, nor to criminal cases below the grade of felony, except when the punishment is confinement in the Penitentiary; and this Section shall be subject to such provisions as may hereafter be made by Law.
(Emphasis added.)

should no longer consider initially any appeal that is granted as of right, but that such appeals should be taken first to the Court of Special Appeals, and then, upon writ of certiorari being granted, to this Court. *There being no statutory provisions relating to section 22's grant of an appeal of right to the nonmoving party who loses before a court in banc, such an appeal would necessarily have to conform to the normal appellate procedure established by the legislature and thus be taken to the Court of Special Appeals, with this Court exercising jurisdiction only upon the issuance of a writ of certiorari.*

*Id.* at 420–21 n. 4, 404 A.2d 1040 (emphasis added).

The above footnote suggests that an appellant, such as Mr. Brooks, must comply with the normal rules of procedure governing appeals to this Court, because those rules are an integral part of what is considered "normal appellate procedure." Maryland Rules 8–411 and 8–413(a), with exceptions not here relevant, mandate that an appellant file a transcript of all the testimony presented to the trial court.

The case of *Washabaugh v. Washabaugh,* 285 Md. 393, 404 A.2d 1027 (1979), was decided on the same date as the *Estep* case and was also written by Judge Digges. In *Washabaugh,* it was contended by the appellees that Article IV, Section 22, of the Maryland Constitution violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution because, allegedly, unsuccessful litigants in Baltimore City (unlike similarly situated litigants in other parts of the state) were denied the right to an in *banc* appeal.[16] *Id.* at 397, 404 A.2d 1027.

The Court in *Washabaugh* determined that Article IV, Section 22, did not violate the equal protection of the laws guaranteed by the Fourteenth Amendment. *Id.* at 410, 404 A.2d 1027. In reaching that decision, the Court noted that in

---

**16.** The *Washabaugh* Court assumed, for the purposes of argument, that Article IV, Section 22, did, in fact, not grant litigants in Baltimore City any right to utilize the in *banc* appeal procedure. *Id.* at 403, 404 A.2d 1027.

determining whether a state statutory or constitutional provision violates the Equal Protection Clause of the federal Constitution, "an assessment must be made as to whether the enactment in question impinges on the exercise of any fundamental constitutional right. . . ." *Id.* at 403, 404 A.2d 1027. If the provision in question does deny a fundamental right, then the constitutionality of the provision must be subject to strict scrutiny. *Id.* If no fundamental right is abridged, then courts look to the alternative test for determining whether the statute or constitutional provision passes muster under the Equal Protection Clause, "that is, whether it complies with the so-called 'rational basis test,' as 'bear[ing] a rational relation to or rest[ing] upon some ground of difference having a fair and substantial relation to a legitimate state objective.'" *Id.* at 404, 404 A.2d 1027 (citing *Massage Parlors, Inc. v. City of Baltimore,* 284 Md. 490, 496–97, 398 A.2d 52 (1979)). The denial of a right to an in *banc* appeal is not the denial of a fundamental right. *Id.* at 408, 404 A.2d 1027. Judge Digges explained:

> [N]ot only is there no fundamental right to an appeal or to a given appellate process, but in this instance, *there is no adverse residual effect upon any fundamental right.* In fact, Section 22, when it is applicable, has minimal impact upon the appeal process as *all dissatisfied litigants in those jurisdictions have the option of a normal appeal to the Court of Special Appeals,* with only those electing to travel the court in banc route being bound by that court's decision.

*Id.* (emphasis added).

The "common nickname" of an in *banc* appeal is a "poor person's appeal." *Id.* at 396, 404 A.2d 1027. It allows an unsuccessful litigant in the circuit court the option of avoiding the expense and delay often experienced by appellants who file an appeal to this Court. *Id.* Proceedings before an in *banc* panel are usually far more informal and less cumbersome than the normal appeal process. *Id.* at 399, 404 A.2d 1027. And, a litigant who files an in *banc* appeal is assured that, no matter what else may happen, he or she will never have to go to the

trouble of printing a record extract and filing an appellant's brief with this Court. *Id.*

Appellee's argument that we are restricted to the record before the in *banc* court overlooks the fact that appellants, by the clear language of Rules 8–411 and 8–413(a), are required (with exceptions not here relevant) to file the entire transcript of the proceedings in the lower court.[17] The rules do not exempt appellants who are appealing from a decision of an in *banc* panel's decision. There would be no purpose for requiring those appealing from in *banc* decisions to file the entire record if this Court was not expected to utilize the entire record. Additionally, language used in the *Washabaugh* and *Estep* cases convinces us that a litigant such as Mr. Brooks, who loses an in *banc* appeal, has the option of filing a "normal appeal" to this Court. The right to a "normal appeal" carries with it the concomitant right to have this court review the full record that was before the trial court.

Review of the entire record is especially important in a case like this one where the in *banc* panel has ruled that a trial judge abused his discretion concerning a matter over which the trial judge's discretion has its widest breadth. Accordingly, we shall deny appellee's motion. Our review will be of the entire record—not just the rather muddled record that was before the in *banc* panel.

---

17. One of the exceptions to the rule that the entire transcript must always be filed set forth in Rule 8–413(b), which reads:

**Statement of case in lieu of entire record.** If the parties agree that the questions presented by an appeal can be determined without an examination of all the pleadings and evidence, they may sign and, upon approval by the lower court, file a statement showing how the questions arose and were decided, and setting forth only those facts or allegations that are essential to a decision of the questions. The parties are strongly encouraged to agree to such a statement. The statement, the judgment from which the appeal is taken, and any opinion of the lower court shall constitute the record on appeal. The appellate court may, however, direct the lower court clerk to transmit all or part of the balance of the record in the lower court as a supplement to the record on appeal. The appellant shall reproduce the statement in the appellant's brief, either in lieu of the statement of facts or as an appendix to the brief.

## B.

**Did Judge Heller abuse his discretion in denying the new trial motion?**

 There was a time when a trial court's denial of a motion for new trial was not even reviewable on appeal. *See Merritt v. State,* 367 Md. 17, 24–25, 785 A.2d 756 (2001); *Buck v. Cam's Broadloom Rugs, Inc.,* 328 Md. at 54–59, 612 A.2d 1294. The law has since changed in this regard, however. *Merritt,* 367 Md. at 24–25, 785 A.2d 756. In *Mack v. State,* 300 Md. 583, 600, 479 A.2d 1344 (1984), the Court said:

The question whether to grant a new trial is within the discretion of the trial court. Ordinarily, a trial court's order denying a motion for a new trial will be reviewed on appeal if it is claimed that the trial court abused its discretion. However, an appellate court does not generally disturb the exercise of a trial court's discretion in denying a motion for a new trial.

(Citations omitted.)

In *Buck, supra,* the Court of Appeals stated that the excerpt from *Mack* just quoted was a "correct statement of the law." 328 Md. at 57, 612 A.2d 1294. And, it is clear that it is still a correct statement.

The *Buck* case arose out of an automobile accident. The jury found in favor of Mr. Buck on the issue of liability but awarded him only $3,668 in damages. *Id.* at 53, 612 A.2d 1294. Buck and his wife filed a motion for new trial as to damages only. *Id.* The trial court granted that motion as to Buck, individually, but declined to grant a new trial concerning the Bucks' joint loss of consortium claim. *Id.* at 53–54, 612 A.2d 1294. The jury in the second trial awarded Mr. Buck $87,000 in damages. *Id.* at 54, 612 A.2d 1294. The defendant appealed, claiming that the trial judge abused his discretion in granting a new trial. *Id.* We agreed with the defendant and reversed the second judgment. *See Cam's Rugs v. Buck,* 87 Md.App. 561, 590 A.2d 1060 (1991). The Court of Appeals, however, reversed this Court. *Buck,* 328 Md. at 62, 612 A.2d 1294.

Judge McAuliffe, writing for the Court of Appeals in *Buck*, stressed the importance of giving trial judges very broad discretion in deciding whether to grant or deny motions for new trials in cases where the lower court is called upon to decide the "core issues of whether justice has been done." *Id.* at 57, 612 A.2d 1294. The Court of Appeals said:

The Superior Court of Pennsylvania, recognizing the breadth, importance, and underlying policy concerns supporting a trial judge's authority to grant a new trial, and at the same time recognizing the necessity for restraint in the exercise of that power, made these salient observations:

[A] jury's verdict should not be casually overturned. In our system of justice, the jury is sacrosanct and its importance is unquestioned. The members of a jury see and hear the witnesses as they testify. They watch them as they sweat, stutter, or swagger under the pressure of cross-examination. This enables the jury to develop a feel for the case and its personal dynamics which cannot be conveyed by the cold printed page of a record reproduced for appellate review. But, the trust our system places in the jury's wisdom is not unchecked. The rules of evidence have been arduously developed over hundreds of years in order to provide such a check. These rules prevent jurors from considering facts which might inflame their prejudices but which are irrelevant to the actual case before them. A skillful and zealous advocate is often able to sidestep the technical letter of the rules and enter some evidence which should have been excluded. When such maneuvering threatens the overall fairness of the proceeding, the trial judge should order a new trial. We must afford the judge great discretion in making this decision because he too is present in the courtroom as the evidence is presented. As does the jury, he develops a feel for the human pulse of the case. In short, our seemingly simple decision to uphold the grant of a new trial is actually the end result of a highly complex process involving the interaction of judge, jury, and attorneys. This process has developed over centuries and its compli-

cated dynamics belie its surface simplicity. However, the greatest tribute to its success is probably the extent to which we take it for granted as the ultimate guarantor of justice.

328 Md. at 59–60, 612 A.2d 1294 (quoting *Boscia v. Massaro,* 365 Pa.Super. 271, 529 A.2d 504, 508 (1987)).

The "gist" of Mr. Buck's argument was that the damages awarded to him individually were against the weight of the evidence because the amount was too low. *Id.* at 60, 612 A.2d 1294. The trial judge in *Buck* agreed with the plaintiffs, and the Court of Appeals declined to substitute its judgment for that of the trial court. *Id.* at 60–61, 612 A.2d 1294.

The Court said in *Buck:*

We turn to the question of whether [the trial judge] abused his discretion in granting Buck a new trial. In so doing, we are obliged to consider the breadth of discretion that is afforded a trial judge in making this type of decision. As we have seen in tracing the history of our treatment of this issue, the emphasis has consistently been upon granting the broadest range of discretion to trial judges whenever the decision has necessarily depended upon the judge's evaluation of the character of the testimony and of the trial when the judge is considering the core question of whether justice has been done. We noted, for example, that "[w]e know of no case where this Court has ever disturbed the exercise of the lower court's discretion in denying a motion for a new trial because of the inadequacy or excessiveness of damages." *Kirkpatrick v. Zimmerman,* 257 Md. 215, 218, 262 A.2d 531 (1970).

On the other hand, a trial judge has virtually no "discretion" to refuse to consider newly discovered evidence that bears directly on the question of whether a new trial should be granted. *See Wash., B. & A.R. Co. v. Kimmey, supra,* 141 Md. at 250, 118 A. 648 ("discretion could not be characterized as sound which wholly disregarded evidence by which its exercise should have been aided"). *See also Browne v. Browne,* 22 Md. 103, 112 (1864). And, if newly

discovered evidence clearly indicates that the jury has been misled, a new trial should be granted.

*Id.* at 57–58, 612 A.2d 1294.

When Mr. Bienkowski filed his motion for new trial in this case, the gist of his argument, as in *Buck, supra,* was that the verdict was against the weight of the evidence. Although the jury awarded him the precise amount he claimed for several categories of economic damages, he complained, *inter alia,* that no damages were awarded for his pain and suffering damages in his individual claim for personal injuries and no solatium damages in his wrongful-death action.

A jury's failure to award non-economic damages, even though the record shows that it is very likely that the plaintiff did experience significant pain and suffering, does not necessarily warrant a new trial. This is made crystalline by three cases where it was held that the trial judge did not abuse his discretion in denying plaintiff's motion for new trial: *Butkiewicz v. State,* 127 Md.App. 412, 417, 732 A.2d 994 (1999)(No award for non-economic damages, even though plaintiff, within three days post-accident, underwent two surgeries—the first operation resulted in an incision 9.6 inches long and approximately four inches wide and a second operation that involved the grafting of skin from plaintiff's right leg onto his left thigh.); *Kirkpatrick v. Zimmerman,* 257 Md. 215, 216, 262 A.2d 531 (1970) (Jury awarded plaintiff $2,500 in total damages, even though medical specials were approximately $3,100, when there was "no doubt that the ... plaintiff endured much pain and suffering. . . ."); *Grabner v. Battle,* 256 Md. 514, 515–16, 260 A.2d 634 (1970)(Plaintiff awarded property damage only, even though plaintiff struck her nose on the steering wheel and, because of the nose injury, was "required to undergo a complete nasal reconstruction and a submucous resection.").

■ The essential underpinning for the reversal by the in *banc* panel of Judge Heller's decision is the alleged fact that counsel for Mr. Brooks "did not dispute that [p]laintiff had a loss of household services" because (allegedly) defense coun-

sel, during oral argument before the panel, conceded "that during her life Mrs. Bienkowski performed household services." We have reviewed the transcript of the argument presented to the in *banc* panel, as well as the entire record before that panel, and have found no concession on the part of defense counsel that "plaintiff had a loss of household services" or that "during her life Mrs. Bienkowski performed household services." What counsel admitted during oral argument before the panel was that the plaintiff had presented evidence that Mrs. Bienkowski performed household services. Defense counsel said, however, that due to the nature of such testimony he was unable to contradict it inasmuch as the defendant did not know, one way or the other, what domestic conditions prevailed in the Bienkowski household. Defense counsel made it clear to the panel that the defendant took the position that it was up to the jury to assess the credibility of plaintiff's witnesses concerning what services Mrs. Bienkowski rendered. In that regard, he stressed that the jury was instructed that they were entitled to believe all, some, or none of the testimony of any witness and that they were the sole judges of credibility. Defense counsel was, of course, correct in this regard. *See Butkiewicz,* 127 Md.App. at 428, 732 A.2d 994.

In many tort cases, defense counsel are unable to contradict portions of the damage claim asserted. Loss of consortium claims provide a good example. Defense counsel, no matter how well prepared, in most cases, cannot put on proof as to the pre-accident relationship between the couple who bring a loss of consortium claim. But that does not mean that the defendant concedes the truth as to testimony supplied by the plaintiffs in that regard. And, the jury is not required to believe any part of plaintiffs' evidence.

In his brief, appellee argues that "given [a]ppellant's *admission* that .... [a]ppellee's loss of household services had a value of at least $96,437, the failure of the jury to award Mr. Bienkowski *at least that amount* not only is 'violative of fact and logic' but clearly deprived Mr. Bienkowski of damages

over which there was *no reasonable dispute.* (Emphasis in original.)

It is true that the defense called Manuel Smith as an expert witness and that he testified to the $96,437 figure mentioned. But that figure, like the figure espoused by Dr. Hamilton, was not based on any testimony presented at trial as to what household services Mrs. Bienkowski actually performed during her lifetime.

The foundation facts for the opinions as to the value of the loss of household services focused on the Bienkowskis, individually, only to the extent that both Dr. Hamilton and Mr. Smith considered the ages of the Bienkowskis—and Mr. Smith also considered how much Mrs. Bienkowski earned working outside the home and that she was likely to work outside the home for some (unspecified) time in the future. Otherwise, both the experts based their opinions upon life expectancy statistics and various studies showing the number of hours, *on average,* persons, in various age groups, performed household tasks. As mentioned earlier, the number Mr. Smith arrived at was based on the assumption that Mrs. Bienkowski would perform twenty hours of household services per week for about seventeen years. If she did so, the loss of those services would be valued at $96,437. But no evidence was presented as to the number of hours per week Mrs. Bienkowski actually spent performing household services.

It was the jury's function to evaluate the credibility of the expert witnesses and the adequacy of the foundation for their opinions. The jurors were instructed that, in judging the credibility of expert witnesses, they should keep in mind "that the opinions expressed [by the expert] can only be as good as the basis upon which those opinions are formed." Even though the defendant called Mr. Smith as his witness, the jury very well could have believed that the underlying rationale for his opinion did not rest on a solid foundation. By way of example, the jury could have believed that Mr. Bienkowski—whose health was poor—would not live to be eighty-one as Mr. Smith assumed; alternatively, they could have believed that

all the testimony as to future household services was too speculative because it had not been proven to their satisfaction as to what services Mrs. Bienkowski rendered in the past or was likely to have rendered in the future or the worth of such services.

Judge Heller and the jury heard testimony in this case for four days, and the jury deliberated for a fifth. Except for Mr. Brooks's testimony, which was self-serving, there was no direct evidence as to where Mrs. Bienkowski was in relation to the travel portion of the roadway when she was struck. Moreover, contrary to appellee's assertion, the answer to the question as to where Mrs. Bienkowski was positioned was not clearly provided by circumstantial evidence provided by other witnesses. The liability issue in this case was hotly contested, and as a consequence, both parties elected to rely heavily upon the testimony of expert reconstruction witnesses.

Judge Heller disbelieved appellee's expert. Assuming, for instance, that Judge Heller believed that Exhibit 8(h) actually showed clumps of grass, not tread marks, or that Mr. Manning's reason for saying in deposition that the striking vehicle had turned left at a 35 degree angle and saying at trial that he turned at a 18.5 degree angle was implausible, it is easy to see why the court did not believe that Mr. Manning was credible and why he believed that the jury had arrived at a compromised verdict. He was in a good position to make a reasonable judgment in regard to these matters because he had seen the witnesses, and the jurors' reaction to the witnesses and could develop "a feel for the human pulse of the case." *Buck*, *supra*, 328 Md. at 60, 612 A.2d 1294 (quoting *Boscia v. Massaro*, 529 A.2d at 508).

It is well known to all seasoned observers of our tort system that compromised verdicts are common in civil cases, at least in jurisdictions that do not have comparative negligence statutes. Save for Maryland, three sister states (Virginia, Alabama, and North Carolina), and the District of Columbia, all jurisdictions in the United States now have comparative negligence statutes. *See* Dobbs, *The Law of Torts* (2000), Section

201 at 504(2000). In states that do not recognize comparative negligence, it cannot be said that justice has not been done or that the trial court should grant a new trial simply because a verdict is extremely low due to compromise on the issue of liability. Cases from Pennsylvania, which did not have a comparative negligence statute until 1982,[18] are illustrative. In *Bacsick v. Barnes*, 234 Pa.Super. 616, 341 A.2d 157 (1975), as in the present case, liability was hotly contested and the trial court recognized that the verdict was a compromise; nevertheless, the trial court denied plaintiff's motion for new trial. The Pennsylvania Superior Court said in *Bacsick:*

> As our Supreme Court noted in *Black v. Ritchey*, 432 Pa. 366, 370, 248 A.2d 771, 773 (1968), quoting *Karcesky v. Laria*, 382 Pa. 227, 234, 114 A.2d 150, 154 (1955), " '[t]he doctrine of comparative negligence, or degrees of negligence, is not recognized by the Courts of Pennsylvania, but as a practical matter they are frequently taken into consideration by a jury. The net result, as every trial judge knows, is that a large majority of negligence cases, where the evidence of negligence is not clear, or where the question of contributory negligence is not free from doubt, the jury brings in a compromised verdict.' "

*Id.*

Earlier, in *Boyd v. Hertz Corporation*, 219 Pa.Super. 488, 281 A.2d 679 (1971), the Pennsylvania Superior Court made essentially the same point as made in *Bacsick:*

> Compromised verdicts are both expected and allowed. *Elza* [*v. Chovan*, 396 Pa. 112, 152 A.2d 238 (1959) ], *supra*, at 115[152 A.2d 238], *Karcesky v. Laria*, 382 Pa. 227, 114 A.2d 150 (1955). "The compromise may arise out of damages or negligence where the balance of evidence concerning *either* or both, and the grant of a new trial may be an injustice to the defendant rather than an act of justice to the plaintiff." (Emphasis added.)

---

**18.** Pennsylvania's current Comparative Negligence Statute is found at 42 Pa.C.S. § 7102 (2002).

*Id.* at 685 (quoting *Elza v. Chovan,* 396 Pa. 112, 152 A.2d 238, 240 (1959)).

Recently, in *Butkiewicz v. State,* 127 Md.App. at 429, 732 A.2d 994, we quoted, with approval, what the *Bacsick* Court had to say in regard to compromised verdicts. In *Butkiewicz,* liability was hotly contested, and although the plaintiff may have exaggerated the extent of his non-economic damages, there was no doubt that he had experienced at least some significant pain and suffering. *Id.* at 417, 732 A.2d 994. The jury found the defendant liable for plaintiff's injuries and awarded him the exact amount plaintiff requested ($25,867) for past medical expenses and lost wages. *Id.* at 421, 732 A.2d 994. The jury, however, did not award the plaintiff any non-economic damages. *Id.* Plaintiff filed a motion for new trial, in which he contended that the jury's failure to award non-economic damages contravened the court's instruction that, "[i]n considering damages . . ., [the jury] shall consider . . . the physical pain and mental anguish suffered in the past and with reasonable probability may be expected to experience in the future; the disfigurement associated with the accident. . . ." *Id.* The trial court denied the motion for new trial, and on appeal, the plaintiff argued that the court had abused its discretion in doing so. *Id.* Citing *Leizear v. Butler,* 226 Md. 171, 172 A.2d 518 (1961), we pointed out that "the Court of Appeals has made clear that a jury's verdict in a personal injury case is not necessarily invalid when the jury awards damages for medical expenses and lost wages without also awarding damages for pain and suffering." *Id.* at 423–24, 732 A.2d 994.

In holding that the trial court did not abuse its discretion in denying the motion for new trial, we pointed out in *Butkiewicz* that there were "several aspects of appellant's case that could have prompted the jury to" make no award of non-economic damages. *Id.* at 428, 732 A.2d 994. Among those aspects was the fact that there was a dispute among the experts as to the degree of plaintiff's permanent disability and there was testimony suggesting that the plaintiff had exaggerated the intensity and duration of his pain and suffering. *Id.* Accordingly, it

was "axiomatic that the jury, as the trier of fact, is entitled to judge the credibility of the witnesses," and "[b]ased on discrepancies in the evidence, the jury was not required to accept [plaintiff's] testimony or the testimony of his expert ... concerning the extent of [plaintiff's] pain and suffering." *Id.*

As an additional reason for reaching our conclusion that the trial judge did not abuse his discretion in denying plaintiff's motion for new trial, we said:

> In reaching our conclusion, we are also mindful that, as the State suggests, the jury may have reached a compromise verdict, because the issue of negligence was hotly disputed. To be sure, the doctrine of comparative negligence is not the law in Maryland. Nevertheless, in the politics of jury deliberation, conflict upon the members of the jury as to liability may ultimately be resolved by means of reduced damages. In that regard, we note again that the jury awarded appellant the precise amount of his past medical expenses and lost wages.

Cases from other jurisdictions have refused to overturn verdicts of this sort. For example, in *Bacsick v. Barnes,* 234 Pa.Super. 616, 341 A.2d 157 (1975), the Pennsylvania Superior Court upheld a verdict awarding a personal injury plaintiff damages of $21,500 in lost wages and medical expenses but only $2,000 in non-economic damages. The plaintiff in that case was walking in the street two days after a heavy snowfall when a passing automobile struck her, breaking her leg. The woman had been forced to walk in the street because the sidewalk was covered with snow. In affirming the jury's verdict, the Court said:

> In the instant case, the evidence was such that the jurors might easily have differed as to whether or not [the defendants] were negligent in allowing the accumulation of snow to remain on or along part of the sidewalk, as to whether [the plaintiff's] act of walking along Fifteenth Avenue carrying a bundle amounted to contributory negligence, and as to whether the accident occurred because [the plaintiff] slipped and fell into [the car's] path or because [the driver of the car] ran her down.

*Id.* at 428–29, 732 A.2d 994 (footnote omitted).

In *Butkiewicz,* after quoting the *Bacsick's* observation that compromised verdicts are commonplace—"as every trial judge knows"—the Court concluded by stating:

> We do not mean to suggest that the trial court would necessarily have erred or abused its discretion had it ruled otherwise. The court had discretion to grant appellant's motion for new trial, just as it had discretion to deny it. Under the circumstances attendant here, the resolution of appellant's motion depended intrinsically upon "the judge's evaluation of the character of the testimony and of the trial," and its determination of "the core question of whether justice has been done...." *Buck,* 328 Md. at 57, 612 A.2d 1294 (citations omitted).
>
> In conclusion, we cannot say that the court abused its discretion in denying appellant's motion for new trial.

127 Md.App. at 430, 732 A.2d 994.

Even though Judge Heller said in his written opinion that he believed (as soon as the jury announced its verdict) that the jury had arrived at a compromised verdict, and despite our discussion of compromised verdicts in *Butkiewicz,* the in *banc* panel did not attempt to explain why the denial of a motion for new trial would not have been justified based solely upon the fact that a compromised verdict had been rendered. In fact, the in *banc* panel never mentioned compromised verdicts in their opinion. Likewise, in appellee's brief, no discussion of compromised verdicts appears.

In cases where liability is hotly contested, a compromised verdict, in which the jury finds for the plaintiff as to liability but awards no non-economic damages, can be a verdict that renders basic justice to the parties. Judge Heller said that he believed this was such a case. We are unable to say that he was wrong. The jury was told that they were not required to believe the testimony of *any* witness. This meant, of course, that they were not required to believe Mr. Bienkowski or any other witness called to discuss damages. Alternatively, the jury could have had serious doubts about whether the proof of

non-economic damages was too speculative and in the "politics of jury deliberation," the jury could have given the full amount requested as to one damage element (*e.g.*, the $20,860 for Mrs. Bienkowski's future loss of wages) and zero dollars for other types of damage. Judge Heller was in a far superior position than we, or any other appellate court, to determine whether the compromised verdict of the sort he believed was rendered in this case achieved justice.

Appellee argues that in deciding the new trial motion Judge Heller "wholly disregarded" the "totality of the evidence presented at trial." According to appellee, this is demonstrated by Judge Heller's written opinion. Appellee asserts that the opinion makes it very clear that the trial judge made *no* effort "to consider, weigh, or evaluate the substantial non-expert evidence, including the rather damning evidence provided by [a]ppellant himself. . . ." In support of this contention, appellee complains that Judge Heller's discussion of negligence issues "is limited to a page and a half of text consisting of merely five short paragraphs, only two of which superficially address the evidence presented at trial." He also complains that, other than mentioning the testimony of the two accident reconstruction witnesses, he did not even mention the testimony of other witnesses, including witnesses who contradicted a portion of Officer Russell's testimony.

Judge Heller, who appellee's counsel conceded was a "wonderful trial judge," was not required to write an opinion to prove that he had weighed and considered all the evidence, nor is there any requirement in the law that a trial judge set forth a summary of what was testified to by all important witnesses. Trial judges can, and usually do, deny new trial motions without even a hearing—much less an explanation of the denial.

In arriving at his decision, Judge Heller recognized, explicitly, that he was "called upon to evaluate the character of the testimony and of the trial in determining whether justice had been done when considering a motion for new trial." We can

find nothing in the record that would suggest that he failed to perform that duty [19] or abused his discretion.[20]

**JUDGMENT OF THE IN *BANC* PANEL REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY WITH INSTRUCTIONS TO ENTER JUDGMENT IN ACCORDANCE WITH THE JURY VERDICT; COSTS TO BE PAID BY APPELLEE.**

---

**19.** Appellee also argues that the trial judge "should have at least recited the *evidentiary basis* for his perplexing conclusion" that Gregory Manning's testimony was not credible. (Emphasis in original.) Depending on what witnesses were believed by Judge Heller, there was a clear evidentiary basis for believing that Mr. Manning was not a credible witness. Therefore, we see no reason why he should have explained the obvious.

**20.** In *North v. North*, 102 Md.App. 1, 13–14, 648 A.2d 1025 (1994), we said:

[Abuse of discretion] has been said to occur "where no reasonable person would take the view adopted by the [trial] court," or when the court acts "without reference to any guiding rules or principles." It has also been said to exist when the ruling under consideration "appears to have been made on untenable grounds," when the ruling is "clearly against the logic and effect of facts and inferences before the court," when the ruling is "clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result," when the ruling is "violative of fact and logic," or when it constitutes an "untenable judicial act that defies reasons and works an injustice." (Citations omitted.)